May it please the court, my name is Dennis Whittlesey, I'm counsel for Duke County Appellate and I'd like to introduce my colleague and law partner, Vishnu Ramaswamy, who's working with me today on this particular case. As this court knows full well, this is the second time this case has been before this court and I think that it's important that I emphasize just a couple of points. We're not challenging the Matuta status as a tribe or its status as a recognized tribe or its right to have land in trust or its right to conduct gaming on land that qualifies for gaming under the Indian Gaming Regulatory Act. The tribe is seeking to conduct gaming on a land parcel that it says is restored land, as that term is used under the Indian Gaming Regulatory Act, and if the land qualifies as restored land, the tribe has an absolute statutory right to conduct gaming. Now if it's not restored land, there are other provisions for taking land into trust for gaming that would perhaps be up slightly different tracks for the tribe to follow, but in this case, the restored land designation is opposed by the tribe and as Judge Randolph said in the July 2010 decision when we were here before, at page two in his opinion, he said the issue is whether the land qualifies as restored land under IGRA, or IGRA as some people say, and at page three it was stated the tribe must demonstrate a significant historical connection to the land. Now the court referred this matter back to Interior in that decision for the reason that the Interior Department admitted it had not only failed to review our expert witnesses report written by the ethno-historian Dr. Stephen Dow Beckham of Lewis and Clark College, but they had chosen not to because they'd already made up their mind, and this court referred this matter all remanded back to Interior for consideration in light of the Beckham report. The Beckham report contained one thing that was absolutely critical, reproduced in total the Chico Reservation role as the Indians of California census conducted 1928-1933 prepared, and that role is a role that was conducted by the government in anticipation of land claims to be litigated by the Indians of California in the U.S. Claims Court. Each head of family was interviewed by Department of Justice census takers, BIA actually was the agency within the department. Each head of family witnessed an affidavit with a BIA enrollment officer which contained detailed information as to the blood quantum, tribal affiliation, ancestry of parents, grandparents, other information, and as Dr. Beckham reported, that information demonstrated that the Indian population on the Chico Ranch was consisted of the members of eight tribes, one of which was Mechoota, as well as descendants of Hawaiians, African-Americans, and whites, and our contention is that that's an interesting combination, but it does not demonstrate success or an independent tribe. That was Mechoota. I'm sorry? Which report are you referring to? This is the Indians of California census that Beckham reproduces. It was conducted in 1928-1933 by the BIA. Which Beckham report are you referring to? It's the original Beckham report, the 2006. That census was never discussed in the Interior Department decision. All that was said was that they had reviewed censuses and other reports. And so that report was, I guess, reviewed. Oh, censuses and affidavits, those were the words they used. And I guess that report may have been reviewed, but it certainly wasn't discussed, nor was there any reconciliation with the determinations or with the findings of fact that that census, that that census revealed, which was, as I just said, there's eight tribes, only one of which was Mechoota, as well as non-tribal ancestry. Now, the curious thing about it is that was the final of four censuses that were conducted at the Mechoota tribal village. The first was conducted in 1914 by a BIA employee named W.C. Randolph. Randolph listed 51 adults on his census identified by blood, name, blood quantum and age, and he said, I do not believe these Indians belong to any particular band, but a remnant of various small bands originally living in Butte and nearby counties. This is important for one reason, the claims traced to the Treaty of 1851, and that's a treaty that was executed by Mechoota, as well as other tribes. And the simple fact is that Mechoota was only one. And so as Randolph looked at it, he sort of validated that makeup, that the Mechoota was only one. It wasn't a Mechoota tribal treaty. It was a Mechoota and several other tribes. So am I right that your position is that this evidence in this report conclusively shows that there was no Mechoota tribe present at this ranch at that time? Well, there was no, there's no Mechoota tribe at that time that's directly descended from the treaty tribe. It's a tribe. I'm just narrowing the facts that the report is showing, in your view, are that there was no tribe there. Ergo, there could not have been a tribe relating back to the 1851 treaty negotiating tribe. No, no, I don't think, I don't think we've said that. There was, there were several tribes that were at the treaty council, one of which was- No Mechoota tribe at the ranch. At the 1851 treaty council. No, no, I'm talking about the data you're pointing to, which is not 1851 data, but data from the census, 1918 and, right? The census data that you're pointing to is not from 1851. The census data that you're pointing to is early 20th century census data. And I'm trying to understand your position about what that shows, and I took your position to be that that shows that there was no Mechoota tribe, as of the time of that census, present on the ranch. There were, that's, I think that's right, because the tribe had not yet been federally recognized. And so the tribe was- But I thought your position was more profound than that, federally recognized or not. You're saying as a matter of fact, on the ground, no tribe there, no Mechoota tribe there. No. Okay. What we're saying is that whatever, whether, whatever the Indian population was, it was not the modern, it was not a direct descendant, it was not directly related to, as a tribe, to the treaty tribe of 1851. That's the connection. That's the lack of connection. But I thought the way you were showing that, and I'm sorry if I'm seeming to repeat my question. I thought the way you were showing that was, because data about connection is hard to find over a long period of time, was to say there was actually no Mechoota tribe present at the time of the census, and therefore, it was an impossibility that there could be any such tribe that relates back to the 1851 negotiators. Okay. No. That is a correct statement. Pardon? There were Indians, there was a population there, a wild, a diverse population, which is shown in that census and in Dr. Beckham's conclusions, but the population was a disparate group of Indians living there that became subsequently, now going beyond Beckham's report, that group was subsequently recognized, but it was recognized as a tribe of that reservation so that not as the successor to the treaty tribe, and because indeed, as the censuses that we quote, going all the way back to 1914, 1910, and 1906, demonstrate that there was a disparate population, and for instance, the Kelsey report in 1906, which is only 50 years after the treaty, demonstrated, it identified 27 heads of household without any tribal identification, now any tribal identification, although Interior cited the Kelsey, did cite Kelsey as saying that he showed Mechoota heads of household that identified two people, Loponzo and somebody else, but in fact, didn't do that. So all Kelsey said was 17 of these people, 17 were identified, who were identified in Kelsey were missing four years later in the decennial census of 1910, wherein the census information was ignored by the three tribal experts, Bates, Bibby, and Tiley, and of the village that Kelsey was visiting in 1906, was a basically a non-settled, non-cohesive unit, and you get to the decennial census of 1910, which was conducted by the, I think the Department of Commerce, it was the original Indian population census schedule, and that village of Chico, only seven of whom identified themselves as having any Mechoota or Mechoota-Maidu ancestry, and of those same 49, 19 identified their sole Indian ancestry as Maidu, 20 identified their ancestral tribes as other than Mechoota or Maidu. Again, this information was ignored by the Bureau of Indian Affairs. So can I ask this question about that? I'm sorry. Can I ask this question about the suggestion that it was ignored? So the determination does say, according to the county's review, the Mechoota tribe as it exists today originated on the Bidwell Ranch as an amalgamation of Indians from numerous tribes and non-Indians. That's correct. And then they go on to analyze why that doesn't preclude the finding that the historical connection has been made. That's correct. So why doesn't that discussion address the point that you're making? I'm sorry? Well, I thought the point that you're making is, and maybe I'm getting back to the question that Judge Biller was asking, but I thought the point you're trying to make with this census data that was in the 2006 Beckham Report is that it shows that, what ultimately comes from that is that it shows that there's an amalgamation on the property. Right. That's correct. But that was responded to. Well, yes. Well, the census material, Beckham's report was not directly responded to. I think the way it was responded was they said, we looked at censuses and affidavits and we concluded that this tribe was directly descended from the treaty tribe. But in the end, they didn't mention the decennial census. They didn't mention Kelsey. They didn't mention Randolph. And they didn't reconcile this disparate group of people that were identified in the Indians in the California census as anything other than a direct descendant tribe from the treaty tribe of 1851. That's the point I'm trying to make. So there wasn't a specific enough. It sounds to me, and I may be missing something basic, but it sounds to me like the general discussion at JA 406 to 408 roughly addresses, at least at a general level, the point that you're making. But your point may be that it wasn't specific enough because it didn't specifically reference a particular census. Well, I think that's right. For some reason, interiors, well, I can't. Well, for some reason, the interior didn't do the job. And they didn't reconcile Beckham's report with their conclusion. And they were ordered to take the Beckham report into consideration. But it's barely mentioned. And certainly the findings of that census, which we think were amazing, when we found them, we were surprised. Certainly that should have been addressed. And it wasn't. So the answer is, well, then there was the Coleman report. And that was the NIGC's decision. Well, Coleman didn't do any better than the Department of the Interior. Coleman did not make the finding, did not connect the dots, did not draw the lines together. So is it your position that it's the amalgamation of different people of different ethnicities and potentially tribal affiliations at the Bidwell Ranch that forecloses the conclusion that the Secretary arrived at? That is our position. And if they were to argue that there could be a number of different tribes subsisting kind of cheek by jowl in the same place, your response to that would be, that's not this case because? My response to that would be, I'm astonished that somebody would make that statement. The Matutka Tribe is federally recognized as a tribe today. The question is, does the tribe as it exists trace? Can it directly trace its tribal existence as a tribe back to the treaty tribe? Because if it can't, and we say they cannot, the census records basically establish our point. If it can't, then it can still do gaming. But it's going to have to do gaming under a different set of standards, which is it's newly acquired land and it's not restored land. And at that point, there are other things the county could do, could raise, because it's a different part of the same statute. But it's after acquired land, Section 20 of ICRA. But restored land is a special exception for a tribe that's restored to federal recognition. And in this case, it has to be the land that was occupied and used by the tribe. And there has to be a specific set of standards. And Interior said that one of the things that would have to be shown, and for instance, well, we did introduce records out of time because of the cutoff that we had faced. And we did respond to the Tiley report out of time. Well, we did so in light of the Esch v. Uter case in this court, which shows that it's appropriate to produce out of late documents where the documents were known to the agency at the time of the decision. Every one of these censuses is an Interior Department census. Putting aside the procedural argument, I know that's a substantial part of your submission. And I'm not saying otherwise. But just putting aside for the moment, what's your substantive argument that what the tribe has submitted to the Department during remand was a new application? Because I thought that the thing that was determinative of whether something is a new application or not is whether it goes to the same parcel. And the new information that they submitted did concededly go to the same parcel that they're trying to use. They did submit additional material. But again, it's a new application. And you characterized that in your briefing as a new application. That's right. I did. And so I'm trying to understand more about what's the basis for that claim. It was still seeking land into trust as restored land. The same land? The same land. So whatever the tribe did, it did. But it was pursuing the application for the land that they had already identified. And I assume purchased. I think they even say at some point they'd already purchased the land. So it wasn't really a new application. It was going to that same application. It's called a revised application or perhaps part two of an application. All right. Anything further? We'll give you some time on rebuttal. I'm sorry? We will give you some time after the government. Thank you, Your Honor. Good morning. Good morning. May it please the court. My name is Jeff Bielert. I'm here on behalf of the federal appellees. This court should affirm the judgment in favor of the federal appellees and the intervener, Michupta Tribe. The department complied with the district court's remand order. It followed the procedural requirements for an informal agency adjudication. And it supported its decision to take the Chico parcel into trust for gaming purposes by substantial evidence. The county has spent a good bit of its time talking about censuses. I think even the county in its presentation here and in its brief acknowledges that each and every one of those censuses shows a presence of Michupta Indians residing at the Bidwell Ranch. I'd also like to point out, even if we look at this tribe as an amalgamation, what's important is that in 1899 to 1902, Michupta children were enrolled in Bureau of Indian Affairs schools. The department discusses this. In 1914, federal government had discussions with the tribe regarding trust lands. In 1918, Annie Bidwell died and left a trust, a private trust, for this tribe. In 1933, the tribe that was existing at the Chico Ranchiera contacted the federal government. The federal government treated the tribe as a sovereign, as a political entity, and had discussions about taking the parcel into trust. In 1939, the United States established the Chico Ranchiera. What's the baseline for finding a historical connection? How far back do we need to go? Do we need to go pre-contact? It's the evidence of the whole is the standard that you look at. In this case, what the department did, and Judge Srinivasan mentioned this earlier, it started pre-contact. It started with the history of the Maidu tribes in California. The Michupta was one of those tribes. Yes, it's true that there's not that much evidence out there, but we do have some evidence from early- If we thought that evidence was insufficient or unpersuasive, and again, I'm not saying that I think that, but if we did, could we start in 1933? Could we start in 1939? Absolutely, Your Honor. I think that the department actually does make this point in the record at J.A. 425. I understand it's in the discussion talking about the Tarchieri, and it analyses whether it was under jurisdiction, but what the department says is even assuming arguendo, that there's somewhat of an argument to be made that this tribe is nothing but an amalgamation. What you're looking at is a tribe that was under federal jurisdiction, tracing it back not just to the 1851 treaty, but to what I was starting with right here, which is the fact that you had children enrolled in BIA schools, the fact that you had a federal government treating the tribe all throughout its occupancy at this ranchiera as a government entity, and that it continued to do so when it created the ranchiera in 1939, and then again when it terminated the ranchiera. So Congress passed the California Ranchiera Act in 1958, and then in 1968 the government terminated the trust relationship with this tribe. So even if it was an amalgamated tribe, we were still treating it as a federally recognized tribe, and in fact it was. The settlement that was negotiated between the government and the tribe in 1992 due to litigation, again, the government treated the tribe as a federally recognized tribe and recognized it again in 1992. Since that recognition... But as you mentioned, all of that discussion, that's not in the secretary's decision, but more in the record in the carcieri discussion. So you're not actually arguing that the secretary did base the determination on that more recent tribe? No, no. I know, so to be clear, I want to be clear here. So what the secretary did is this is where I started. It started with the early contact. It started with the fact that this was a tribe that resided at what was called Chico Creek, that early settlers got a land grant from the Mexican government even before there was the United States' presence in California, and that this tribe always existed there. There were a number of villages that the tribe traces its history back to that were near Chico Creek. There was a summer camp that was referenced. The department at JA 394 through 396 talks about field research by Dixon, by Kruber, by Hart Merriman, all confirming that Maidu tribes existed in the Sacramento Valley, including the Mechoopda. The 1840s, talking about the contact with Bidwell himself, the small villages that were located there. And in 1851, when the federal government arrived to have treaty negotiations, Bidwell himself went out and gathered all the local tribes to include the Mechoopda. The Mechoopda signed a treaty with the United States of America. Unlike Professor Beckham, who characterized the Mechoopda as a dialect or as a tribelet, the government didn't hold that view because it recognized the Mechoopda as a tribe and, in fact, signed a treaty with that tribe. And that's evidence to suggest that all along the federal government treated this as a tribe and it continued to do so all the way through and up until termination, which I was referencing earlier. We talked about these. How does the government evaluate? Just focusing, zeroing in, and I know this isn't the approach that the secretary took, but zeroing in on what your opponent has characterized as sort of when the thread broke in the early 20th century. Can you put any more flesh on the bones of how the government dealt with, how the United States government dealt with that census information, with the notion that there were not really tribes present as tribes on the ranch. There were a number of different people in a kind of multi-ethnic mix. Right, and the department talks about that all throughout the decision. Just to start out, and I provided a string site in my brief, but this claim that we did not address or that the department somehow did not address Professor Beckham is not supported by the record. I mean, on the very first page of the decision, it talks about Beckham's report all throughout. It addresses the censuses in a very general concept, and again, I would point your attention to JA 419 to 27, and it does occur in the Carchieri analysis, but in that context, it specifically refutes some of the evidence that Beckham is relying on. For example, this report by the clerk, the Bureau of Indian Affairs clerk, Randolph. The department read the same report and said, you know what, yes, it's true. This clerk has a view that it was nothing but a mixed group of Indians. That view was not shared by other department officials. In fact, even looking at his views alone, they can't terminate the trust relationship that existed at that time. Talking about the censuses, I mentioned this earlier. Every single census shows the presence of Mechupta. The department recognized that there was an influx of other Indian tribes. The department talks about how those other Indian tribes became and embraced Mechupta culture. Mechupta culture survived throughout the period that the village on Bidwell's Ranch, the Indians became part of the Mechupta tribe and were treated as such. All throughout, as they point to, the censuses show a presence of Mechupta, and I understand that they have a different view of the evidence, but this is an APA case, and it's not for this court to have a de novo trial to weigh the evidence, either the court's reading or, for that matter, Beckham's reading or the county's reading. What does our deference to the agency's expertise get the agency? I understand you can weigh competing data. What about at the level of some methodologies, because it does seem like the different views of the parties in this case are ships passing in the night. I don't disagree with that characterization, Your Honor, and I do think that the department looked at some of the exact same evidence that was relied on by Beckham and reached a different conclusion as to what that historical evidence suggests, and in some sense it is ships passing in the night, but I think that the deference here says that the department gets to weigh the evidence. The department gets to look at what the parties put before it. It gets to go through, and it did in this case. I mean, this is a thorough, well-reasoned decision, as the district court recognized. The department goes through each and every one of these pieces of evidence. It's footnoted throughout. It's a 53-page report that goes through this, and I think what we talk about and what this court talked about in 2010 when it vacated the decision is that the decision must be supported by substantial evidence. And is it also your position that the department gets to choose the methodological approach, which is not just a question of weighing evidence, but a question of sort of maybe higher-order judgments about how relevance is assessed and how. . . Well, I do. . . I mean, I'm not to suggest. . . I mean, we cite cases. This is not the APA. This is not a shield that you can't look at a thorough review of what the department did here. I mean, I'm not trying to hide and say that, you know, we get carte blanche to decide how to go about this, but this is an informal adjudication under the APA. And, you know, this court made clear in 2010 that there are different requirements for how the department goes about considering evidence. In this particular case, the earlier decision was vacated. It was remanded to the district court. The district court asked the parties, how should we go about complying with this court's order? All three parties submitted something to the district court saying, here's what your remand order ought to look like. Let me just a little bit more specific on the methodological question that I was asking. One could read the record to show the department relying more on sort of the survival and continuity of culture, cultural practice, a group identity, and the county to be countering. But you're not responding to our evidence, evidence which, in its own terms, looks at ancestry and sort of blood quantum. And my sense is that the department is unconcerned by the notion that some of the members that it is counting as tribal members may not be blood Mechoopda. A, is that correct? And B, do you think that decision is one entitled to deference? I don't, by the premise, Your Honor, that the department somehow doesn't care about the blood quantum. I think my point was just to suggest that the same evidence that the county is putting so much weight on, these census reports, is not the only evidence in this record. And that's important because we look at the record as a whole and whether you can establish by substantial evidence to support the conclusions reached by the department. And so in this particular case, what you have, and this is sort of the longer list I started with, what you have is not just census reports, which the department candidly and does directly address in its decision, but you have all of this evidence in the record, starting with the pre-contact, going through the treaty, going through the early 20th century where there were children enrolled in the schools, going through the way that the federal government interacted with the tribe throughout the period that it was residing at the Bidwell's Ranch. And that's the evidence that we're relying on. So it's true that there are, as with any tribal case, you may have evidence in the historical record that points one way. You may have evidence that points another way. The department's job is to go through and, you know, the county says reconcile. Well, reconcile, in their view, really means accept exactly what we say it means. And that is not what the department does. The department is an expert agency, as Judge Pillory pointed out. And the department does not need to accept their reading of the historical evidence. It's the department's job to go through and address that evidence, which it has done in this case. It's done throughout the decision, and the department has addressed contradictory evidence clearly, and it said why it reached a different conclusion as to why this parcel should be taken into trust. And under the Administrative Procedure Act, this court should affirm the department's judgment or the department's conclusion here that this parcel does qualify. I would like to point out, it's unclear to me, the county comes in here and says, well, we're not challenging their status as a restored tribe. What we're challenging is this particular parcel. It's unclear to me how the Mechoopda as a restored tribe would ever be able to satisfy the test that Butte County has come up with in order to acquire restored lands. And I think if you read their briefs and you read their arguments and the things they're saying here today, they would never be able to do so. And that just is not right. The Mechoopda tribe has a long history in this area. It's a history that is well documented in not only the department's decision, but in the records that it is relying on, and the Mechoopda should be allowed to acquire this parcel in trust. Unless the court has any other questions. Thank you. Thank you. Counsel for appellant? Oh, I beg your pardon. Sorry. Please. Oh, I'm sorry. Beg your pardon. Good morning. Michael Anderson representing the Mechoopda Indian tribe. Our brief sets forth our view that the district court was proper in ruling that the APA was not violated when it allowed any and all information from both parties in the remand process, that the extension of time for the appellant was correct and reasonable under the APA, the one extension they were granted to submit information in response to our submission, and finally that the overall decision in January 2014 was correct. So we believe the court was correct on all those matters. What I wanted to address today was counsel's arguments regarding the historic nature of the Mechoopda tribe and their attempt to bifurcate the current Mechoopda tribe, which is federally recognized. Appellants have a very difficult case here in that if they don't challenge the political status of the Mechoopda tribe, it's very difficult to find out where there would be a broken link in the chain of recognition. In our view, the Rancho del Oro Chico Treaty of 1851 established the political relationship between the United States and the Chico tribe, the Mechoopda tribe. Their leader, Lucky Ahn, signed that treaty in 1851 at the Bilger Elk Ranch with the federal commissioner, Oliver Wozniakraft, as the representative of the United States. That is where we believe the political relationship began. The record of Dr. Kiley shows that there are a number of anthropologists and reports throughout the 1860s, 1870s, 1880s that show that the record reflects that there were leaders of the Mechoopda tribe, and they called them headmen, throughout that time period. For example, General Bidwell had a proclamation governing staying on the Bidwell Ranch in 1885. He recognized Chief Lufanzo as the chief of the Mechoopda Indian tribe. Throughout the record, there are a number of cases like that. So there is an unbroken political relationship, which appellants have not challenged. They also don't challenge our submission and the government's finding that- They do challenge it. They say, as you, I think, really nicely put it, they do argue that there's a broken link. Well, they didn't challenge the 1851 political relationship. In fact, the Beckham Report- They don't challenge that per se, but they say it's a different entity now from that entity. Yes. But they did not- The Beckham Report, which they relied on from 2006, did not even mention the 1851 treaty. So I think that's a fatal flaw in his analysis, a failure of academic purpose in looking at all the proper facts. The other thing that appellants do not challenge is the Carcieri analysis that the Mechoopda tribe submitted and that the department agreed with. If there is a political relationship and the Mechoopda tribe is under federal jurisdiction, as the IRA requires for land to be taken into trust since 1934, that is a political relationship and a finding that the appellants have not challenged. So they have two major problems here in that they have not challenged the political status of the current tribe. The Bureau of Indian Affairs and the Interior cannot create or establish a tribe. They acknowledge tribes. So this tribe has been a tribe since time immemorial. We go back to first contact. In this case, the documented relationship was the treaty time. And if there's not a relationship like that, then the tribe cannot be a tribe. So the department has properly found that they are a tribe. They've been under political jurisdiction since 1934. So what they've been left with, appellants, is a few selected, isolated, out-of-context statements from the record that they try to say, well, here's our evidence that the tribe is not a tribe. How can you help us to understand some of that evidence or give it a little bit more context? And maybe this isn't necessary under our standard of review, but it would help me to understand the case. The relationship between Maidu and Mechoopda. Right. There is a core Mechoopda tribe that had families that Dr. Kiley traced the ancestry, that found the core families from 1851, the treaty signers and the original Mechoopda people, were the same core families throughout through 1950. That these families, the Lofanzos, the Conways, the others were, and there are not a lot of generations here. I mean, it's four or five generations. It was not difficult to trace the lineage. Chief Lofanzo was at the Bidwell Ranch for 35 or so years. And so what she found is that the core families were the same throughout the history of the tribe. And if you look at things even like the appellant just cited in his opening statement, he said that, look, C.W. Randolph came to the tribe in 1914, and this was really one of the key parts of the brief, saying that, I do not believe there are any Indians belonging to any particular band. There are remnants of various small bands originally living in the nearby counties. That was one of their key findings. And, you know, that alone, well, there's actually no bands there. But if you look at the rest of C.W. Randolph's report, he says things like, he had the honor to advise that I visit this band of Indians last Saturday. And I had known before that this band of Indians was occupying land belonging to the Bidwell State. The Indians established the headquarters on the Bidwell Ranch. This band of Indians had the opportunity to pass to acquire land here. There are practically no gardens on the tract now occupied by this band of Indians. Elmer LaFonte claims to be the hereditary chief of the band. After Mrs. Bidwell's death, he noted that we would give the Indians a title to the home now held by them. So, you know, the appellants say, well, geez, there's a remnant of a band. The actual clerk who went there said there's a hereditary chief. There's going to be a home for them later. They have been here for years. I know of this band. And so that's the choice that Interior had to find, is how do you weigh in these type of reports? And it's been misleading and selective evidence that the appellants have used throughout this process to confuse and to try to undermine the long history of the Machu Picchu tribe through this process. So just backing up a little bit, I'm just trying to understand their evidence on the terms they argue at, which I believe distinguishes Maidu from Machu Picchu and also distinguishes Kankau from Machu Picchu. And your position on that is what? Our core, we believe there's a core Machu Picchu. But in census taking, there were sometimes the Machu Picchu who were Machu Picchu identified themselves as Maidu. I mean, they're essentially could be a generic term for the Machu Picchu. Some say Maidu, some say Kankau. It may be whether their mother was a Maidu and their father was a Kankau. But basically that's why we say they're tribelets in that their identification is as Maidu Machu Picchu. Sometimes it says Maidu Machu Picchu in the census, sometimes Machu Picchu and sometimes Maidu. But they're all a community local of actual Machu Picchu. Am I misremembering that Maidu is also more of a language denomination? No, Maidu can be representative of both of a language group, language community, and as an Indian tribe. And is it not the language that all the Machu Picchu speak? That is the generic language that the Machu Picchu spoke. They actually had a specific Machu Picchu language as well. For example, the anthropologists in 1887 found that there were certain words that the Machu Picchu used only for themselves for seasons. Forty years later, Curtis found that the same words were used for seasons as well. So there was a language community and a Machu Picchu community that was also broader with Maidu as well. And how about the Kankau, the relationship to Kankau? The same thing. They're basically, I mean, they're all Indians of the Maidu area, the same region. So it's not like we're dealing with Apache tribes here, Navajo tribes. I mean, they're all basically the same, I guess we'd say cousins through intermarriage. They're all related from probably an earlier general Maidu people. My time has expired. All right, thank you very much. All right, thank you. Yes, counsel for appellants. Thank you. Let me respond to Mr. Anderson's last comment. The interchangeability of Maidu and Machu Picchu is somewhat elusive, at least to my knowledge. Because in the Indians of California census, 1828 to 1933, the heads of households, each head of family identified with a witness affidavit, family information, no Maidu identification is to be found in that census of, in the Indians of California census of 1928, 1933. No. Those, the tribes that were identified in that census, and again, these are heads of households executing affidavits. And if you look at it, there's a lot of detailed information throughout those pages and pages of the reproduced census of 1928, 1933. The village is made up of the following eight tribes. Wailaki, Concal, Noima or Nimuc, Matupta or Machapta, Sioux, that's a plains tribe, not generic to California, Pitt River, Yuki, Wintun, Hawaiian descent, African American and white. No Maidu. So that if the Maidu, if there's interchangeability between Maidu and Matupta, it certainly was gone by that time. In any event, I would say that the census reports demonstrate over a very short period of time, for instance, the Kelsey in 1906, of the 27 heads of household identified by Kelsey, 17 of those people identified as heads of household were gone four years later in the decennial census. So it wasn't this solid, you know, steady rock, rock steady permanent community. It was a lot of influx and outflux. And it shows in these census records. And so when we say that they were not recognized, you know, what I'm saying is this tribe is federally recognized. But I'm saying this tribe does not track as a tribe back to the treaty tribe of 1851. And I don't think anything that's been said here contradicts what I just said. And does it have to? I know that that is the way that the Secretary framed it. So that's very important. But just as a general matter, if they had framed up the opinion in terms of dating back to the 1930s. Well, okay. The track has to be to the treaty. They have to demonstrate to the treaty. The 1851 treaty? I'm sorry? The 1851 treaty? Yeah. Why is that? Because the land they're claiming, they're claiming to be restored land. And the only connection with that land is it's within the area identified as potential reservation land for the tribes that signed that treaty. That's a curious position for the county to be taking. Because the report that you relied on, the baseline report that you relied on, doesn't even mention 1851 in the treaty. Well. So I don't take that to be your point of reference. I'm not sure why Beckham didn't identify the 1851 treaty because certainly he worked with it. And he certainly has in many writings, not necessarily this report, but in his newer report, his 2014 report, I think he talks about the 1851 treaty. Probably at length. I haven't read that recently. But we certainly, he certainly is cognizant of it. And that's been the treaty from which the track has been made all along. So that it's, again, this tribe can still do gaming on that land, but they'd have to go through a different section of the statute. They'd have to establish certain things they don't have to establish under the restored lands provision, which is why they're pursuing it, which would include certain environmental concerns that are not part of this case because they weren't necessary to the restored lands issue. So there's a lot of reasons why the county has spent the time, and I would say a lot of money, on this case. Because it's the restored lands issue without any ability of the county to even discuss any concerns they might have about whether or not, as a matter of environmental law, this is a good site for the county or even, well, certainly even for the tribe, but certainly for the county. So there's a lot of issues not before the court. Carcieri, there's a reason why we never raised Carcieri, and I will state it directly. I will never raise Carcieri. I think it's a blasphemy on Indian country. I don't know. I can't tell you how, I guess that's pretty strong. So I'll stop with that one. I might start using some of those words our mothers taught us never to use, and certainly we never have. So anyway, I would submit that as compelling an argument as we've heard, both from the government and from the tribe, the fact remains there's a missing link between the treaty tribe and this tribe. This tribe can still do gaming, even on this same land, under a different section of the Indian Gaming Regulatory Act. So with that, I respectfully submit my argument and thank the court for its consideration. Thank you. We will take the case under advisement.
judges: Rogers, Srinivasan, Pillard